UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

MATTHEW R. SCHUMACHER,

      Plaintiff,

v.                                                 Case No. 08-CV-228-slc

RICHARD RAEMISCH,
MIKE THURMER, and                          JURY TRIAL DEMANDED
GARY ANKARLO,

      Defendants.

## AMENDED COMPLAINT

Plaintiff Matthew R. Schumacher, by his attorneys, Quarles & Brady LLP, complains against the Defendants as follows:

### PRELIMINARY STATEMENT

1. This is an action brought pursuant to 42 U.S.C. § 1983, seeking declaratory and injunctive relief and damages for Matthew R. Schumacher ("Schumacher"), a prisoner currently confined at Waupun Correctional Institution ("WCI") in its Health and Segregation Complex ("WCI/HSC"). This action alleges that Defendants were and are deliberately indifferent to Schumacher's mental health needs, in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution.

### JURISDICTION

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws and treaties of the United States, and pursuant to 28 U.S.C. § 1343(a)(3) because this action seeks to redress the deprivation, under color of state law, of Schumacher's civil rights.

QB\090022.01284\7809310.7           1

3. This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57.

4. This court has jurisdiction to grant injunctive relief pursuant to Fed. R. Civ. P. 65.

## VENUE

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because one or more of the Defendants resides in this district.

## PARTIES

6. Plaintiff Matthew R. Schumacher ("Schumacher"), at all times relevant to this action, was a United States citizen. Schumacher is a prisoner, convicted by the State of Wisconsin, under the control of the Wisconsin Department of Corrections ("DOC").

7. Defendant Richard Raemisch ("Raemisch") has been the Secretary of the Wisconsin DOC from August 31, 2007, up to the present. He was and is responsible for the safe, secure, and humane treatment of all Wisconsin prisoners, and has the inherent authority to curb or correct any unjust or violative action, and/or omissions made by the Department, or its designees. The Secretary also disposes of inmates' Requests for Corrections Complaint Examiner Review as part of the Inmate Complaint Review System, including the complaints filed by Schumacher regarding his conditions of confinement and the conditions' effect on his mental health. On information and belief, the Secretary also receives a incident report for serious incidents, including suicide attempts requiring outside medical attention. He is sued in his official and individual capacities.

8. Defendant Mike Thurmer ("Thurmer") was the Deputy Warden of WCI until March 30, 2007; thereafter, up to the present, he has been the Warden at WCI. He was and is responsible for overseeing staff and prisoners at WCI, for the safe, secure, and humane custody of all prisoners housed within WCI, and for enforcing all regulations and procedures established by

the Department. Psychological Services Unit ("PSU") staff also report to the Deputy Warden, who reports to the Warden. Thurmer was and is responsible for decisions regarding privileges an inmate has while on segregation and/or Administrative Confinement. He was and is also responsible for reviewing all of the "first step" inmate complaints and all of the appeals for the rejected complaints, including the complaints filed by Schumacher; as such, he had the authority to curb or correct any unjust or violative actions and/or omissions made by the staff in WCI. He is sued in his official and individual capacities.

9.    Defendant Gary Ankarlo ("Ankarlo") has been at all times relevant to this action the PSU Supervisor at WCI. Ankarlo was and is responsible for the development, administration and coordination of all psychological programs within the unit, including supervision of the staff, provision of direct services, consultation and support activities. In addition, Ankarlo provides psychological services to inmates, makes recommendations for institutional programming, assists in providing training to staff, and participates with other PSU staff in case conferences and staffing. As PSU Supervisor, Ankarlo was and is continually informed of an inmate's mental health treatment. He is sued in his official and individual capacities.

10.   All of the above-named defendants were acting under color of state law at all times relevant to this action.

## ALLEGATIONS OF FACT

### BACKGROUND

11.   WCI/HSC is designed to house 180 prisoners.

12.   Schumacher is an inmate in WCI/HSC, and has been at all times at issue in this action.

13.   Schumacher is seriously mentally ill and has been diagnosed with, *inter alia*, Major Depressive Disorder, Adjustment Disorder With Depressed Mood, Anxiety Disorder, and

Anti-Social Personality Disorder. He has attempted suicide many times throughout his adult incarceration.

14. On June 10, 2002, Schumacher was identified as being "seriously mentally ill" and consequently transferred out of the Wisconsin Secure Program Facility ("WSPF"), pursuant to the Order of the Western District of Wisconsin in *Jones'El v. Berge*.

15. WCI/HSC is a segregation unit with a highly controlled environment in which an inmate's property, privileges and movement are tightly restricted. No mental health screening is performed before an inmate is placed in WCI/HSC. The physical structure and conditions of confinement within WCI/HSC cause extreme physical and social isolation, which exacerbates preexisting mental illnesses. Inmates placed in WCI/HSC do not have the same access to mental health treatment as other inmates, and the mental health care that is available is grossly inadequate.

16. Schumacher is caught in a "Catch-22" situation. The extreme conditions of confinement at WCI/HSC, in combination with grossly inadequate mental health treatment programs, have exacerbated his mental illnesses, leading to incidents of self-harm and/or attempted suicide. Such attempts of self-harm or suicide have resulted in disciplinary action by the DOC, including conduct reports, which then factor into, and have been used to further justify, Schumacher's continued placement in WCI/HSC.

17. Defendants are aware of this "Catch-22." According to a March 2009 Report of the Legislative Audit Bureau ("LAB Report"), in January 2005, the Segregation Workgroup convened by the DOC recommended that PSU staff provide "formal input" into the disciplinary process for mentally ill inmates and developed a form that it recommended be used for seriously mentally ill ("MH-2") inmates who commit conduct violations that could result in segregation

placements. However, DOC policy does not require use of the Segregation Workgroup's form because it is time-consuming to complete. The Segregation Workgroup recommended changing the administrative code to explicitly include mental illness as a mitigating factor in the disciplinary process. To date, no such change has been implemented.

18. According to the LAB Report, three recent external evaluations of the DOC found "shortcomings in inmate mental health care services," including "mental health treatment that is insufficient in type and frequency to meet inmates' needs." On information and belief, Defendants are aware of these reports.

**DEFENDANTS' DELIBERATE INDIFFERENCE TO SCHUMACHER'S MENTAL HEALTH VIOLATES SCHUMACHER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS**

19. Schumacher re-alleges paragraphs 1 - 18 of this Complaint as if fully set forth herein.

20. Schumacher has been confined to WCI/HSC almost continuously since October 10, 2006. The conditions of confinement in WCI/HSC are such that they physically and socially isolate Schumacher and cause severe mental health stress. These conditions have exacerbated Schumacher's mental illness, which has gone largely untreated.

21. On information and belief, the conditions at WCI/HSC, including the restrictions, privileges, physical conditions, and mental health care, are significantly harsher than those of any other segregation unit in the Wisconsin prison system, with the possible exception of WSPF, and therefore exceed what is required for security reasons or other valid prison management requirements.

**Severe Physical Conditions**

22.	In WCI/HSC, Schumacher is locked in his cell for 24 hours a day with very limited exception. Schumacher is not permitted outside the WCI/HSC except for hospital visits related to suicide attempts serious enough to require emergency medical attention.

23.	Each cell in the WCI/HSC is composed of four concrete walls, a sliding metal door with a small observation window, and a trap through which trays, medicine, and other items can be passed.

24.	Each cell in the WCI/HSC has one small window with frosted glass. The window allows very little natural light to pass through, so that Schumacher cannot determine the time of day, only that it is night or day. The frosted glass in the window prevents Schumacher from viewing the outside.

25.	In Schumacher's cell, there is a nine watt florescent night light that is illuminated at all times that Schumacher cannot control. Schumacher is instructed not to cover the night light and his face and eyes at night. If he does so, he is subject to discipline.

26.	The lack of natural light and the constant illumination from the nine watt night light interferes with Schumacher's ability to sleep.

27.	There is a concrete divider down the center of each wing of WCI/HSC that prevents Schumacher from seeing other inmates in the wing.

28.	Schumacher is not allowed to have any pictures of family or friends, newspapers, or magazines.

29.	When Schumacher is on Administrative Confinement, he is allowed only one ten-minute phone call a week, and three two-hour visits per month. When he is on "Step One" in segregation, he is not allowed any phone calls. When he is on "Step Two" in segregation, he is allowed one ten-minute phone call a month and one one-hour visit per week. If he is on "Step

Three" in segregation, he is allowed one call per week for a total of two ten-minute phone calls per month and one one-hour visit per week.

30. The limited visits for WCI/HSC inmates, including Schumacher, are conducted via video.

31. Only third-shift correctional officers conduct rounds on the WCI/HSC. Schumacher's opportunities for interaction with correctional staff are limited to these rounds, officers passing out his meals or medications, escorting him to recreation, health appointments, or visits, and supervising his showers.

32. Schumacher is permitted no outdoor recreation. Recreation is offered for up to four hours a week, time permitting. Recreation takes place is one of six metal cages located in a concrete room at the end of the wings in WCI/HSC. The cages ("Rec Cages" or "cages") vary in size from approximately 8 X 8 to 8 X 10 feet. The cages contain no exercise equipment. The temperature in the cages is the same as that of the outside.  During winter months, snow may be found on the floor of the cages, and temperatures can be below zero, but Schumacher is only provided canvas shoes. If Schumacher attempts to collect extra socks or pack tissue paper around his toes in order to keep warm, he risks a conduct report and/or a paper restriction. DOC coats are provided; however, the coats are stored outside in the Rec Cages, and thus, in the winter, the coats are cold and stiff. The cages are also often filthy, as they contain used toilet paper, dust, blood, spit and/or urine. Because of the conditions of the Rec Cages, Schumacher sometimes chooses not to use them and remains locked in his cell.

33. If an inmate is on a 2-officer escort/special cuffing restriction, as Schumacher was when he first arrived at WCI/HSC, the inmate exercises alone at the end of the recreation period. Schumacher, when he has been placed on an "Rec-alone" or "exercise alone" restriction, as he

was from November 5, 2007 to December 2, 2007; December 5, 2007, to December 21, 2007; and from September 3, 2008, to October 2, 2008, is required to exercise alone at the end of the recreation period.

34.     To talk to another inmate while in his cell, Schumacher must do so through his door, shouting over the general din.   If he does so he risks a conduct report.

35.     Because Schumacher is locked in his cell for nearly 24 hours a day, alone; because of the concrete divider; because of the limited opportunities for visits and because visits occur via video; and because of limited opportunities for recreation and interaction even with staff, Schumacher's contact with other persons is extremely limited.

36.     The conditions in WCI/HSC, outlined in paragraphs 22 - 35, are highly damaging to Schumacher's mental health.

37.     According to the LAB Report, the January 2005 report of the Segregation Workgroup "cited a 'growing recognition among mental health professionals, correctional administrators, and accreditation organizations' that the health of mentally ill inmates can deteriorate as a result of the isolation and inactivity of segregation." On information and belief, Defendants are aware of these reports.

### Grossly Inadequate Mental Health Care

38.     Mental health resources at WCI are systematically inadequate.

39.     According to the LAB Report, the National Commission on Correctional Health Care ("NCCHC") standards, upon which the DOC has based many of its standards pursuant to Wis. Stat. § 302.385, inmates in segregation should be monitored three days per week by medical or mental health staff.   On information and belief, WCI falls far short of this standard.

40. Also according to the LAB Report, a DOC list of psychological services unit priorities developed in July 2006 and updated in June 2008 recommends weekly segregation rounds for mentally ill inmates. WCI does not do segregation rounds for mentally ill inmates.

41. According to the LAB Report, WCI has the highest number of prison suicides in Wisconsin. This report, moreover, notes that (i) suicide rates are significantly higher in Wisconsin's prisons as compared to prisons in other states, and (ii) mentally ill inmates are overrepresented in segregation in Wisconsin prisons.

42. WCI has no specialized management unit for mentally ill inmates in segregation. According to the LAB Report, in January 2008, 61.2% of the inmates in segregation at WCI were identified as having mental health needs ("MH-1") or as seriously mentally ill ("MH-2").

43. Schumacher's mental health designation has gone from MH-2 to MH-1 and back to MH-2. DOC psychological staff has classified Schumacher as MH-1 even in the face of evidence and information such a classification was not appropriate. For example, Schumacher has an extensive history of suicide attempts and self-harm incidents, and was previously found to be seriously mentally ill.

44. On October 14, 2007, Schumacher attempted to hang himself twice, and the following day, while on observation, he cut his wrists. Yet, on October 19, 2007, a PSU psychologist, Jeff Garbelman ("Garbelman"), approved by Ankarlo, still coded Schumacher as MH-1, removed his Axis I diagnosis of anxiety disorder, and did not add any alternate diagnosis. It was not until December 4, 2007, after another serious suicide attempt requiring a hospital stay, that Garbelman and Ankarlo changed Schumacher's diagnosis to Major Depressive Disorder, Recurrent and classified him as MH-2.

45.     Given inadequate levels of staffing, the only time Schumacher sees a psychologist one-on-one is while in observation, or after requests, sometimes repeated requests, to see someone. There is often a significant delay between the request and the contact; in some cases there is no follow up. Contact is also sometimes at cell front and is therefore less private and effective. When Schumacher is actually able to see a psychologist out of cell, that visit takes place across glass, and the things Schumacher and the psychologist say echo around the room.

46.     Due to the lack of mental health services at WCI/HSC, Schumacher has spent significant periods of time without monitoring or contact with a psychologist.

47.     In or about October 2008, after Schumacher filed this lawsuit, WCI/HSC began to offer a small "group" session once a week.  Recently, the schedule for this weekly group was changed to every other week.

48.     In early 2009, after Schumacher filed this lawsuit, WCI began a cognitive-behavioral program in which WCI/HSC inmates might be eligible to participate. However, that "program" primarily takes place in cell, via "self-help" workbooks.

49.     Privileges in segregation depend on the "Step" on which the inmate is placed. The "Step System" in the WCI/HSC consists of three levels or "Steps." Advancement depends on inmate adjustment and conduct reports. Schumacher's mental illness causes him to attempt suicide and commit acts of self harm that often result in conduct reports, which makes advancement to a less restrictive step difficult or impossible.

### Schumacher's Suicide Attempts and Self-Harm

50.     Schumacher has repeatedly attempted to commit suicide or otherwise harm himself as a result of the harsh conditions and lack of mental health services.  These incidents of self harm were known to, or reported to, Defendants Ankarlo and Thurmer.  On information and

belief, at least some of these incidents of self harm were also reported up to Defendant Raemisch, Secretary of the DOC.

51.     In some cases, Schumacher was placed on observation status; however, placement in observation was used as a short term solution, and did not actually prevent Schumacher from hurting himself on at least two occasions. Without adequate mental health care, and substantial follow up, moreover, placement in observation has done nothing to improve Schumacher's situation, which has grown increasingly desperate.

### September 23, 2007, Suicide Attempt

52.     On September 6, 2007, Schumacher informed PSU staff (Garbelman), that he preferred to be transferred back to the WSPF, an institution that he was removed from pursuant to a court order which declared the conditions at WSPF to be unfit for seriously mentally ill prisoners. The reason Schumacher gave Garbelman for this request was that he felt WCI/HSC's conditions were far worse than those at WSPF, and because he felt that it would only be a matter of time before he attempted to commit suicide or otherwise harmed himself.

53.     On September 23, 2007, Schumacher obtained a razor while in the shower, removed the blade, and cut his throat open from his Adam's apple to right below his ear, requiring him to be transported to Waupun Memorial Hospital. He received numerous stitches to close the wound.

54.     On September 24, 2007, Garbelman and Ankarlo signed a psychological services record that in part summarized Schumacher's statements that he wanted to die, noting Schumacher had "black and white thinking," and that Schumacher was not amenable toward establishing a meaningful safety plan. The record noted his continued thoughts of death.

55.     On September 25, 2007, PSU staff released Schumacher from observation. Ankarlo signed the release on September 28, 2007.

October 14 & 15, 2007, Suicide Attempts

56. On October 10, 2007, Schumacher wrote to Garbelman, wanting to know if anyone was going to come talk to him, and noting that it had been 14 days without contact (despite the attempted suicide 18 days prior). Schumacher told Garbelman he was "barely holding on." Schumacher also asked for access to a pen. The request was received October 11, 2007. On October 12, 2007, Garbelman responded, but only regarding the pen, and informed Schumacher that Garbelman had requested the all sharps restriction to be removed.

57. On October 14, 2007, only 19 days after being taken off observation status and four days after he informed Garbelman that he was "barely holding on," Schumacher twice attempted to hang himself. After a first unsuccessful attempt, Schumacher again tied his sheets into a noose, attached it to an air vent in the cell, climbed on top of the sink, put the noose around his neck, and jumped. The sheet held for approximately 20 seconds before it broke. Because of this suicide attempt, Schumacher received physical injuries to his neck and throat.

58. Schumacher notified an officer (Debra Gempler) that he was going to cut himself if placed back into the cell he had just hung himself in. Garbelman was contacted about Schumacher's hanging attempt, and approved regular cell placement. Despite this warning, Schumacher was placed back into that cell, on observation status, instead of being placed in the open observation cell where he could be closely monitored by the in-cell camera.

59. Approximately 12 hours after the previous suicide attempt, Schumacher used a staple to cut his arm, requiring on-site medical care and two stitches.

60. On October 16, 2007, Ankarlo signed psychological services records summarizing both of the above-described suicide attempts.

October 24, 2007, Self-Harm

61. Following the October 14, 2007, suicide attempt, Schumacher remained on observation status for three days until October 17, 2007.

62. On October 21, 2007, Schumacher contacted the Security Director, Don Strahota ("Strahota") stating that he did not feel safe in the WCI/HSC and that the conditions make him depressed, suicidal, and that he was hearing voices and was going to kill himself. Schumacher also requested to be transferred out of the WCI/HSC. Strahota referred the request to Ankarlo.

63. On October 21, 2007, Schumacher also contacted Ankarlo, requesting transfer to the Wisconsin Resource Center ("WRC"), a facility that houses and treats mentally ill DOC inmates, and mental health treatment/maximum custody at a different institution, and stating that he could not take it on the WCI/HSC any longer. Schumacher further warned that he would hurt himself if he were subjected to the conditions of the WCI/HSC.

64. On October 24, 2007, Ankarlo placed Schumacher on observation status for expressing thoughts of self-harm. On October 25, 2007, while on observation, Schumacher cut his forehead open by banging it into a door. The injury required treatment by a Health Services Unit ("HSU") nurse. Schumacher was released from observation on October 29, 2007, by Ankarlo. At the time of his evaluation by Ankarlo, Schumacher informed Ankarlo that he would prefer to be at WSPF because WCI's segregation is "the worst."

November 3, 2007, Self-Harm

65. On November 3, 2007, only five days after Ankarlo released Schumacher from observation status, Schumacher secured a piece of metal and cut both his arms numerous times, requiring medical attention.

66. Garbelman and Ankarlo signed psychological services records noting the November 3, 2007, self-harm.

### November 23, 2007, Suicide Attempt

67. On November 7, 2007, Schumacher wrote Ankarlo requesting placement at the WRC. The only response Schumacher received from Ankarlo was that he should continue to work with his primary clinician, Garbelman.

68. On November 18, 2007, Schumacher wrote to Raemisch stating in part that he could "not take it" in the WCI/HSC and that it makes him "lose [his] mind and suicidal." The Secretary received this letter on or about November 26, 2008, and responded on December 18, 2008; however by that time, Schumacher had already attempted suicide again.

69. On November 20, 2007, Schumacher wrote letters Thurmer, Garbelman, Ankarlo, a Crisis Intervention Worker, and Security Director Strahota, stating, in part, "all I think about is trying to kill myself," and requesting a transfer. He also stated, "I will kill myself." Schumacher was not put on observation status or in an observation cell.

70. Schumacher had written a last will and testament. On information and belief, Thurmer told Garbelman to put Schumacher on observation, and Garbelman knew of Schumacher's last will and testament. However, Garbelman, after speaking with Schumacher, did not put Schumacher on observation.

71. On November 23, 2007, Schumacher obtained a piece of metal and cut both his arms from wrist to elbow. Due to the severity of cuts and amount of blood loss, Schumacher was sent to Waupun Memorial Hospital for medical intervention. The treating physician at Waupun Memorial Hospital noted in his report that Schumacher's suicidal ideation needed to be dealt with more aggressively and that that he would discuss placement with the institution.

### "Stabilization" at Wisconsin Resource Center

72. One December 11, 2007, Schumacher was finally transferred, at Garbelman's request and with Ankarlo's approval, to WRC, but only for evaluation and "short-term"

stabilization. At WRC, Schumacher was diagnosed with, *inter alia*: Major Depressive Disorder, Recurrent, Mild; Anti-Social Personality Disorder with Borderline Features; and separation from support system.

73. While at WRC, Schumacher behaved appropriately. However, on information and belief, Schumacher was sent back to WCI due to WCI's "conceptualization" of him as a security risk rather than an individual with severe mental illness in need of treatment. While at WRC, Schumacher was adamant he would hurt himself if returned to WCI/HSC.

74. Schumacher appealed the decision to send him back to WCI, asking for a transfer to a different maximum security institution and stating he would kill himself if returned to WCI/HSC. Then, while still at WRC, Schumacher cut his left arm. He was taken to an outside hospital and treated. A week later, Schumacher's appeal was denied.

75. Schumacher was provided with medication while at the WRC. Currently, Schumacher is on Vitamin D and iron pills.

June 9, 2008, Suicide Attempt

76. Schumacher was returned to WCI/HSC on March 6, 2008. Soon thereafter, he wrote to his social worker and to the Program Review Committee ("PRC") requesting a transfer to another maximum security institution where he could participate in programs. PRC responded, saying there was nothing it could do at that time, and that he would be seen months later, in November 2008.

77. On June 9, 2008, Schumacher cut himself with a staple deep enough to require treatment at Waupun Memorial Hospital.

78. On information and belief, Schumacher had not been seen by PSU staff, including Garbelman and Ankarlo, for over a month before Schumacher hurt himself on June 9, 2008.

October 1, 2008, Suicide Attempt

79.     Schumacher continued to request a transfer from WCI/HSC and complain about the harsh conditions and lack of mental health services.  For example, Schumacher wrote a letter on July 7, 2008, to Garbelman, Thurmer and Strahota, requesting a transfer to another maximum security institution because he did not feel safe and because he wanted mental health programming. On July 9, 2008, Strahota responded, stating there was no reason for security to consider a transfer, that he would not support a transfer, and that if PSU felt the need PSU would have to make referral.  However, on July 11, 2008, Garbelman spoke with Schumacher about how "transfers are not under the purview of the PSU."  On July 13, 2008, Schumacher asked PSU to recommend a transfer. The next day, Garbelman informed Schumacher that Ankarlo indicated PSU would not make any such referral.

80.     On information and belief, Schumacher was only seen four times by a PSU psychologist after July 11, 2008, and before October 1, 2008.

81.     On October 1, 2008, Schumacher cut his arms, resulting in a seven centimeter wound on his left arm and an approximate three centimeter long would on his right arm.  He was transported to Waupun Memorial Hospital, where he stayed for two days and received a blood transfusion.

82.     A week later, Strahota told Schumacher that Schumacher needed to change his behavior if he wants a transfer.

83.     On January 4, 2009, Schumacher wrote to Garbelman, stating in part "you know I don't want to live" and that what Garbelman was doing was not enough.  Garbelman responded the next day, stating in part, "if the problem is that you don't want to live, what is it that anyone can do except remove property, use restraints, etc." and to "stop selling to yourself [and] others that you'd rather be dead . . . ."

### March 11, 2009, Self-Harm

84. On March 11, 2009, Schumacher cut his arm with a pen insert, re-opening a scar from a prior cutting.

### April 16, 2009, Self-Harm

85. On April 16, 2009, Schumacher, while in his regular WCI/HSC cell, told an officer he had a pen and that the officer had better bring clinical down to talk to him. No one came. Schumacher cut himself, passed out and had to be transported to an outside hospital, where he received six stitches to his arm.

### The "Catch-22"

86. On October 17, 2008, a decision was made to place Schumacher on Administrative Confinement. This decision was due largely to Schumacher's attempts at suicide and self-harm.

87. While Administrative Confinement is supposedly a "non-punitive" involuntary status, an inmate is still segregated, privileges are restricted, and the DOC admits that such segregation results in "prolonged social isolation." Fundamentally, Administrative Confinement is segregation, but of indefinite duration.

88. Thurmer affirmed the decision to put Schumacher on Administrative Confinement.

89. Schumacher is now on Disciplinary Separation ("DS") and remains housed on the WCI/HSC. Currently, Schumacher is on Step One of DS, and has been told that after 270 days of DS he will again be returned to Administrative Confinement.

90. On information and belief, security staff has informed Schumacher that Schumacher would be eligible for a Behavioral Health Unit (BHU) program, but that Schumacher cannot take advantage of this program or unit, because of his segregated status.

Continued Risk

91.     Schumacher continues to have thoughts of suicide and self-harm. Schumacher continues to be at substantial and immediate risk of irreparable injury, with substantial risk that he will harm himself, attempt suicide, or commit suicide if he continues to be housed in these conditions and without adequate mental health care.

## CAUSES OF ACTION

92.     Defendants Raemisch, Thurmer and Ankarlo have acted, and continue to act, with deliberate indifference to Schumacher's serious mental health and safety needs by, among other things, failing to implement or offer a process to screen prisoners housed in the WCI/HSC for mental illness; subjecting Schumacher to the harsh conditions of confinement set forth herein; and failing to implement effective procedures for suicide prevention at WCI/HSC.  These acts and omissions have caused Schumacher to suffer serious physical injury, and physical and mental pain and suffering, all in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution.

93.     Schumacher's legal remedy is inadequate, and there is a substantial and immediate risk of irreparable injury.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

94.     Schumacher has exhausted such administrative remedies as are available to him.

## RELIEF REQUESTED

WHEREFORE, Schumacher respectfully requests relief from the Court as follows:

1.      A Declaratory Judgment that the circumstances outlined in this Amended Complaint violate Schumacher's rights under the Constitution and laws of the United States.

2.  Injunctions barring Defendants and their agents from housing Schumacher in the WCI/HSC and barring them from keeping him in continuous, indefinite Administrative Confinement or segregation without treating his underlying mental illness.

3.  Injunctions requiring Defendants to provide Schumacher with adequate mental health screening and services, including access to BHU, and requiring some flexibility in the disciplinary process to account for Schumacher's mental illness.

4.  Injunctions requiring Defendants to modify the conditions of confinement for Schumacher to accommodate his mental illness, and to impose the least restrictive conditions necessary, including eliminating 24-hour-a-day lighting, allowing photographs of loved ones and/or family members, and providing better recreational opportunities.

5.  As to Defendants named in their individual capacities, compensatory and punitive damages to Schumacher in an amount to be determined at trial.

6.  Attorneys fees and costs in accordance with 42 U.S.C. § 1988 and other applicable law.

7.  All such other and further relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

8.  Schumacher demands a jury trial on all claims so triable.

Dated this 1st day of May, 2009.

QUARLES & BRADY LLP

 /s/ *Gregory T. Everts*
Gregory T. Everts, Esq.
State Bar No. 1001636
Elyce Wos, Esq.
State Bar No. 1058559
33 E Main Street, Suite 900
P.O. Box 2113
Madison, Wisconsin   53701-2113
Telephone:   (608) 283-2460
Fax:   (608) 294-4911
E-mail:   Greg.Everts@quarles.com
              Elyce.Wos@quarles.com

**Attorneys for Plaintiff Matthew Schumacher**